*This was a petition for a Writ of Error. The petitioner was indicted in the Superior Court of Spottsylvania, of the murder of John Goss. He was convicted of murder in the second degree, and sentenced to an imprisonment in the Public Jail and Penitentiary-house for 18 years. After the conviction, he moved the Court to set aside the verdict, and grant him a new trial, on the ground, that the verdict was contrary to evidence ; which motion was over-ruled by the Court. He excepted to the opinion of the Court, and at his request, the evidence as given on the trial, was inserted in the exceptions ; the exceptions are as follows :
“Memorandum : On the trial of this Indictment, the following evidence was given, and at the request of the prisoner, is drawn up by the Judge from his notes, after the conviction. Claiborne W. Durrett, a witness, called on by the Commonwealth, deposed, that on the evening of the day of last, the prisoner, John King, with John Goss, the deceased, and one Burnett, and Mankin, and the witness, and several others, were at a small house near the new Toll-bridge in the town of Eredericksburg. The prisoner and Burnett began to play at Cards on the counter for whiskey, and the prisoner lost a half pint of whiskey with Burnett, which the witness says was not called for: the prisoner then played with John Goss, the deceased, and Goss lost a half pint of whiskey to the prisoner, which Goss immediately called for, and it was brought. They continued playing, and when the cruet of whiskey was nearly out, Goss said it was the whiskey he had called for ; the prisoner said no, it was the whiskey he had lost with Burnett. Goss maintained it was not, and King, the prisoner, said, any person who said he had not brought in the whiskey he had lost with Burnett, told a damn’d lie. Goss, the deceased, said he would not take the lie from any man, and began to strip off his coat, and stripped it. The prisoner made no-preparation to fight, and when they engaged the prisoner had on his coat and hat. At this time and when they were playing, they were on opposite sides of the counter, and the end of the counter was not far *from the door which opened into the street; Goss, the deceased, being on that side of the counter which would enable him to get to the door first. After Goss had pulled off his coat, both of them made to *144 wards the end of the counter for the purpose of fighting', both appearing to be very angry with each other; they both tried to get hold of each other. Mankin stepped in between them to try to keep them apart, but finding he could not, he stepped' aside; whereupon, the prisoner and the deceased caught hold of each other ; the deceased with both his hands on the prisoner’s shoulders, and the prisoner with one hand on the shoulder of the deceased. The witness saw no blows pass. Goss, the deceased, immediately let both of his hands fall from the shoulders of the prisoner and clapped both of them on the bottom part of his own belly, crying out, “ he has stabbed me with a knife in the belly.” The deceased then stepped back a little, unbuttoned his pantaloons, and his entrails came out of the wound. King, the prisoner, picked up his hat, (which had fallen off,) and went out at the door; at the time they engaged-, the deceased was between the prisoner and the door. The witness went with the deceased to Mr. Jones’s, the distance of yards. He walked, (with assistance,) about one half of that distance; but becoming weak from pain and loss of blood, he was carried the other part of the way. The witness stayed with the deceased all night, sitting up with him the greatest part of the night. He was in great pain, and repeatedly said he was a dead man. The next morning, about breakfast time, the witness again went to see him. He was in great pain, and weak. Several people were there, who told him that he would recover ; he said no, he had no hope of recovering. About this time, (that is, nine or ten o’clock in the morning,) the witness heard the deceased say that King had shed innocent blood. The said Goss died that day, about three or four o’clock in the afternoon. This witness further deposed, that a few days before this event, he saw the prisoner grinding the dirk, (which is now produced in Court, having a blade about five inches in length, made of an iron file, fixed in ahandle, and has a leather sheath,) on his grind-stone. The witness knew the instrument so well that he described it to several people before the prisoner was carried before a Magistrate. Whilst he was grinding it, the witness asked him what he meant to do with it: the prisoner’s reply was, that he meant to kill a shoat with *it. The witness after-wards saw the prisoner whetting the same dirk on his oil-stone in the shop where they both worked. The prisoner then informed him, that he had a few nights before received a severe blow over his right eye from a stone, whilst sitting in his own room, thrown through the window by some person, and that he meant to have his revenge on the person who had done it. The witness further deposed, that the prisoner had no suspicion that the deceased was the person who had thrown the stone at him, but suspected another man. The witness further said, that several persons were in the shop when this declaration was made, and mentioned Bruce and .Cosh as being present. The witness further stated, that as far as he, knew or believed, there had been no previous quarrel, or grudge, between the deceased and the prisoner; that there were many persons in the shop where the quarrel took place, that stood between the place where the prisoner stood and the door, when the quarrel commenced; all of whom except Mankin, seemed anxious for the fight between the prisoner and the deceased, because they thought they were pretty equally matched, and it would be a hard fight. Doctor Carmichael deposed, that he was called in to see. the deceased, about eight or nine o’clock in the evening. A large portion of the entrails were out, and the entrails much cut and wounded. The witness believed that he would die from the first. But, although he was satisfied of it, he never heard the deceased intimate that he expected to die; indeed, to the last hour he never seemed to be apprised of his desperate situation, from any remarks which the witness heard him make. Isaac Jones deposed, that the deceased slept all night nearly. He never heard him express any thing about his situation ; never heard him express a hope of recovery, or expectation of death. John Carter deposed, that he went to see the deceased, about ten or eleven, or twelve o’clock, (soon after his breakfast) of the day he died ; heard the deceased say that he should certainly die, that he had no hopes of living till sunset— had no shadow of hope: That he was going out of the world unprepared, but that he hoped for mercy. [Note. The testimony of Carmichael, Jones, and Carter, was introduced before Durrett closed his testimony; in order that the Court might ascertain whether it was proper to admit the declaration of Goss, (the deceased,) made to Durrett, “ that King had shed innocent blood,” as the declaration of a dying man ; the *Court being of opinion, that to make that declaration admissible evidence, it was necessary not only that the person should be dying, but that he should be conscious he was dying, and that there was no hope of his living, at the time the declaration was made. On hearing the evidence of the last witness, as well as that of Durrett, the evidence of the declaration was admitted.] Richard Johnston deposed, that he with others, pursued King, the prisoner, and was present when he was arrested. The prisoner denied that he had any dirk. Mr. Orrill, who was present, said he had a dirk, whereupon, Mr. Benson, and another person seized hold of his arms, and Orrill found the dirk on the prisoner, and took it from him, and the dirk now produced in Court is the one which was taken from him. William Orrill deposed, that he was present when the occurrence took place. The pris-^ oner and the deceased played for liquor ; Goss ° lost and called for a cruet, and it was brought; when the cruet was nearly out, King said it was the whiskey he had lost with Burnett; Goss said no, it was the whiskey he himself had lost. King, the prisoner, said, if any man said it was not his whiskey, he told a story, or a lie (he could not positively say which, but thinks the word was story). Goss said he would not take it, *145 and pulled off his coat. The prisoner made no such preparation to fight. They both advanced towards the end of the counter, apparently very angry, and got hold of each other. Goss cried out he was stuck with a knife, and the witness saw the prisoner sheath an instrument. When King left the house, the witness with others, pursued him over the bridge, and caught him. The witness stated to the others that the prisoner had a dirk, which the prisoner denied. Two of the party seized hold of the prisoner’s arms, and the witness on searching him, found the dirk in his left hand breeches pocket; the same dirk now produced in Court. On being asked, the witness says that he saw King have hold of Goss’s shoulder, but can’t tell which seized first. The witness being cross-examined said, that King had been hurt some days before by a blow on his head, but he never heard him say who had done it. Goss was nearest the door when the quarrel began, but if King had intended to have gone out of the door, he might easily have done so. Both King and Goss, seemed equally anxious for the fight. Most of the company were anxious for it, as they were young men of about the same size. He says that Mankin *did get in between them to separate them, and did not take hold of King alone. John Burnett, a witness called by the prisoner, deposed that he was present. He heard Goss say that he would not be cursed by any man, and pulled off his coat; there was a tin cup with water in it, on the counter; Goss .took hold and threw the water towards King, and apart of it went on the witness himself and his little girl, but whether or not any part of it touched King he cannot say. There were a number of persons in the shop, between the prisoner anfl the door, all of whom seemed anxious for a fight. The witness had a little girl with him, and as. soon as the quarrel commenced, he tried to get out at the door with the girl, but these persons intercepted him, forming a line across the door, and witness though .very anxious could not get out. Bur-rett and Orrill being asked stated, that they did not see any water thrown by Goss, and that if it had been thrown, they thought they must have seen it. Durrett, Orrill and Burnett stated, that the prisoner had received a severe blow on the head a short time before (the mark of which was still visible,) and the prisoner here in Court opened his waistcoat to shew that his collar-bone was at this time injured, which injury he alleged, he had received, when the blow on the head was given, but the witnesses knew nothing of the injury to the collar-bone. The prisoner- and the deceased were about equal in size, and the deceased was a very strong athletic man. The above is all the evidence which was given ■on this prosecution, so far as the Judge of the Court can now recollect, with the aid of his notes.
During the argument of this Case, the Counsel for the prisoner contended, that in every Case of a scuffle or combat between two parties, where death ensues by a blow given during the scuffle .or combat, and there was no previous malice,' quarrel, or grudge between the parties, the offence cannot be more than man-slaughter. The Court being called on for an instruction to the jury on this question, charged them to the effect following, to wit: That, if they were satisfied that the mortal blow was given by the prisoner, they were to consider: 1. Whether the blow was given in self-defence. 2. Whether it was given in the heat of blood during a combat. If the parties were actually engaged in a combat, and the mortal blow was given during the heat of the combat, the Daw paid so much regard *to the infirmity of human nature, as to consider the offence to be man-slaughter only ; but if the combat had just commenced and the first blow that was given (after the parties had mutually seized each other) was the mortal stab'with a deadly weapon, the Daw considered that malice was implied from the use of a deadly weapon, where the provocation was slight; and that in such Case the offence would be murder ; and this, although it might be the intention of the deceased to carry on, and continue a combat.
The above is the Bill of Exceptions which was signed and sealed by the Court.
The prisoner by his Counsel, now applied to this Court for a Writ of Error to the judgment of the Superior Court, and assigned the following errors; 1. That the offence proved, by the evidence was at most manslaughter, and consequently the jury erred in convicting your petitioner of murder, and the Court, erred in refusing a new trial. The Case made out by the evidence, is that of a sudden quarrel, in which the first threat of violence came from, and preparation to use it was made by, the deceased alone. The parties surrounded, by persons anxious for a fight, whose position as well as that of the deceased, intercepted the retreat of the petitioner, and in which the mortal blow was. given at the time the petitioner thus threatened and surrounded, was actually engaged with, and grappled by his strong and athletic adversary, and exposed in a disabled condition, to a certain and continuing violence, which (although not exerted to produce much injury at the time the blow was given) would certainly not have terminated until he had suffered great . personal injury, and which possibly might have terminated fatally to the petitioner. 2. That the principle of haw contended for by his Counsel was correct, and that the instruction of the Court, though it does not expressly reprobate it, yet as applied to the evidence in this Case in effect overruled it,- and produced an erroneous impression in the minds of the jury respecting its correctness. It is believed, in all cases (that may be deemed worthy of being quoted as authority,), in which malice, has been implied from the circumstance of the use of a deadly weapon on slight provocation, the provocation has arisen from words only, or from a slight assault which has terminated, and no further assault or violence is threatened, or apprehended. But, when the purpose of- using a serious *violence has been indicated, and that purpose so far con *146 summated as to place the person threatened, in the power and grasp of his adversary, so that this violence may be exerted with effect, and to produce great injury, a mortal blow then given has not justified the implication of malice, unless there was some previous malice, quarrel, or grudge. In such a case, had the party waited until this further violence had been used, and had terminated, so as to relieve him from the apprehension of further injury, and then, in a short time after, his antagonist had even retreated, had pursued and killed him, his offence could not be more than man-slaughter. The Law in no Case punishes, or ought to punish with more severity an act which averts a certain and otherwise inevitable injury, than it does the same act when done to avenge such injury after it has been suffered ; though the converse of this proposition is not correct. He therefore prayed that the Writ of Error might be awarded, in order that the judgment might be reversed, and a new trial granted him.
The Court rendered the following judgment :
“ This Court not deciding whether the Bill of Exceptions tendered by the prisoner in this Case to the opinion of the Court over-ruling his motion for a new trial, and signed and sealed by the Court, ought to have been,so signed and sealed, yet are unanimously of opinion, that if the Bill of Exceptions be properly a part of the Record, there is no error in the same, and doth decide, that the application for a Writ of Error, be over-ruled.”
Note (in edition of 1853). — In this Case, it would seem to be very clear, that the prisoner, King-, was guilty of murder. What were the circumstances? A quarrel arose between the prisoner and the deceased, in which the former used an insulting expression. The latter said he would not take it, and prepared for a combat, evidently with fists. The prisoner did not make the same preparation, but seemed anxious for the fight. They rushed towards each other, and grappled. At that moment, the prisoner drew from its sheath a deadly weapon, which had been concealed, and was not seen by his antagonist, and plunged it with violence into his bowels. This was the first and only blow that was given after they had grappled with each other. Here was an undue advantage taken by the prisoner, and there is abundance of authority to prove, that when the killing takes place in consequence of a combat, it is man-slaughter only, when there is no undue advantage taken or sought on either side. Poster, 295; 1 Bast’s Crown Law, p. 241-3, ch. 5, § 24-25. And Hawkins is full and clear to the same effect; Book 1, ch. 31, § 37,28. So Mawgridge’s Case, decided by Lord Holt and his Associates, and which is a leading Case, is a full support to this. Kelyng’s Rep. 128. In that Case M. threw a bottle at the head of C. and immediately drew‘his sword: C. returned another bottle at the head of M. *and wounded him severely; whereupon' M. stabbed C. This was adjudged murder. In that case the battle had commenced by throwing bottles. Here by seizing hold of each other. There the stab was effected by a sword, which was seen by the whole company. Here it was effected by a concealed dirk, against which the deceased had no opportunity to prepare himself, and of which he had no warning. In this particular, this Case seems to be stronger than Mawgridge’s. Taylor’s Case, 5 Burrow, 2793, and Snow’s Case, 1 Leach, 151, were probably relied on, to prove that this was only man-slaughter. But in neither case was the fatal stab given at the first onset, nor until the blood had been heated by repeated blows. In the first case, the prisoner had been thrown down, and collared three times by the deceased, and on the last occasion, with the assistance of another person, violently shoved out of the house. In the last case, the parties had been fighting some time, on the ground, the prisoner underneath. The weapon used was a shoemaker’s knife, which the prisoner had in his hand, using in the way of his trade, when he was assailed by the deceased, and dragged from his bench. These cases do not exhibit such strong indicia of malignity, as the one now reported.
A much more important question would have arisen on this record, if the prisoner had been convicted of murder in the first degree, was this a Case of murder in the ’first or second degree? Our Act declares, “that all murder which shall be perpetrated by means of poison, or by lying in wait, or by duress of imprisonment or confinement, or by starving, or by wilful, malicious,’ and excessive whipping, beating, or other cruel treatment, or torture, or by any other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration, or attempt to perpetrate, any arson, rape, robbery, or burglary, shall henceforth be deemed murder in the first degree. And all other kinds of murder shall be deemed murder of the second degree. 1 Rev. Code of 1819, ch. 171, § 2.
Our Act was borrowed (with some interpolations,) from the Act of Pennsylvania. Their Act declares, “that all murder which shall be perpetrated by means of poison, or by lying in wait, or by another kind of wilful, deliberate, and premeditated killing, or which shall be committed in the perpetration, or attempt to perpetrate, any arson, rape, robbery, or burglary, shall be deemed murder in the first degree.”
There have been several decisions on this Statute, by the Courts of that State, which are highly deserving of attention. In the Case of Mulatto Bob, who was charged with the murder of Negro Da.vidi by striking him with an axe on the head, which penetrated to the brain, Chief Justice M’Kean, in pronouncing the opinion of the Supreme Court, made the following remarks; “Then, let us ask, did the prisoner wilfully kill the deceased? It is not pretended, that there was any accident in the case; and, therefore, the act must have been wilful. Was the killing deliberate and premeditated? or was it the effect of sudden passion, produced by a reasonable provocation? There had been a combat with fists; but this was over, when the prisoner,without any new provocation, first procured a club, and, losing that weapon, afterwards armed himself with an axe. It cannot surely be thought, that the original combat was a sufficient provocation for the prisoner’s taking the life of his antagonist. An assault' and battery may, indeed, be resisted and repelled by a battery mo.re violent; but the life of a fellow-creature must not be taken, unless in self-defence.
It has been objected, however, that the amendment of our Penal Code renders premeditation an indispensable ingredient, to constitute murder of *147 the first degree. But still, it must he allowed, that the intention remains, as much as ever, the true criterion of crimes, in Law, as well as in Ethics; and the intention of the party can only he collected from his words and actions. In the present case the prisoner declared, that he would split the skull of any fellows who should he saucy; and he actually killed the deceased in the way which he had menaced. But, let it he supposed, that a man, without uttering- a word, should strike another on the head with an axe, it must, on every principle hy which we can judge of human actions, he deemed a premeditated violence.” 4 Dallas, 146. *In the case of The Commonwealth v. O'Hara, tried in November, 1797. before M’Kean, C. J., Shippen and Smith, Justices, the circumstances were as follows: "Theprisoner, (indicted for the murder of Andrew Aitkins,) was a journeyman Shoemaker, and was at work in an up stairs room, with John M'Key, John Harkins and others. The deceased came up stairs, entered the room, and said to the Defendant. "I have been talking about you below, this hour.” “Yes,'5 said John Harkins, "about the five sheep you stole.” The Defendant thereupon immediately left his work upon the bench, took up a a Shoemaker’s knife which was by him, went up to the deceased and stabbed him in the belly. The deceased died in the course of half an hour after receiving the wound. The Defendant and the deceased had always been good friends, and the Defendant had in general borne a good character. A story of the Defendant having stolen five sheep in Ireland, had been raised among his comrades probably; and it had been reputed that the Defendant and others had put up hand-bills to that purpose. Immediately after giving the wound, the Defendant walked down stairs without saying a word. The deceased did not know that he was wounded, and upon M’Key’s saying to him, “Andy, you are stabbed,” he answered. “No, he would as soon stab his brother. ” The deceased then called the Defendant up stairs. He came and they shook hands. Defendant went to work again, and sewed three stitches, when the deceased being told there was blood on him, lifted up his jacket and said, “I am gone, you have ruined me.”
The cause having been argued, (by J. B. M’Kean and J. Smith, for prisoner,) M'Kean, C. J., charged the jury as follows: “The question is, of what degree of murder is the prisoner guilty ? What was the Common Law, and what was the intention of the Legislature, in the Act of Assembly which divides murder into different degrees? At Common Law, all the burthen of the proof of extenuating circumstances, lay on the Defendant; but now the burthen of the proof lies on the Commonwealth. Unless the circumstances of malice are proved, it is murder only of the second degree.” (He then stated the evidence, the substance of which is given above.) "The Act of Assembly says it must be wilful, deliberate, and premeditated, to make it murder in the first degree. It was wilful; he did it with an instrument likely to kill. But it is contended, that the Act takes away all implication. What is the meaning of the words deliberately and premeditatedly? The first implies some degree of reflection. The party must have time to frame the design. This is a fact which you must determine. The time was very short. It cannot be said to be done coolly. The Legislature must have put a different construction on the words deliberately and premeditatedly. If he had time to think, then he had time to think he would kill. If you are of opinion that he did it deliberately, with intention to kill, it is murder of the first degree. If he had time to think, and did intend to kill lor a minute, as well as an hour or a day it is sufficient.” The jury found a verdict "guilty of murder in the first degree.” A new trial was moved for, on the ground that the verdict was against Law and evidence, and ought to have been murder only in the second degree. The Co art delivered their opinion seriatim against a new trial. They said, "the Law and facts were stated, and left to the jury. The Court are not warranted in granting a new trial without substantial reasons. None such are offered. The verdict is supported by Law and evidence. If would be of dangerous consequence to admit a different construction of the Act of Assembly than that which was given by the Court. The granting a new trial would imply, that that construction was wrong.'1 Judgment Death. [N. B. The Defendant was pardoned by Governor Mifflin.] Appendix to Smith's Trial.
In the Case of The Commonwealth v. Dougherty tried in 1807, before Judge Rush and Justice Wol-bert, the following remarks were made by the Court:
"It is alleged that the Act of Assembly of 1794 has produced a change in the Law of murder in Pennsylvania. It has so to a certain extent. It has been decided since the passing of that Act, and I think very properly, that the intention is the essence of the crime, and that killing a person with circumstances that evidence a depravity of heart, is in Pennsylvania, murder in the first degree.”
*"From the words of the Act, it would seem, four modes of killing are enumerated, any one of which will be murder in the first degree. In the last, viz. where a man kills another in the perpetration, or attempt to perpetrate the crimes mentioned, the intention to kill is excluded, as not necessary to constitute the crime of murder in the first degree. But with respect to the three other modes of killing, viz. by poison, lying in wait, or any other kind of wilful and deliberate killing, the intention is still the essence of the crime, and its guilt, since the Law, as well as before, consists in taking away the life of a human creature, with circumstances which shew a cool depravity of heart, or a mind fully conscious of its views and designs. Whenever this is the case, whenever it appears, from the whole evidence, that the crime was at the moment, deliberately or intentionally executed, the killing is murder in the first degree. It is sufficient to constitute this crime, if the circumstances of a wicked and depraved disposition of mind, or, as it is expressed in the Law, of wilfulness and deliberation are proved, though they arose and were generated at the period of the transaction. This construction of the Law is certainly a sound one, because it is perfectly agreeable to the words; and the intention, as it ought, still remains and constitutes the essence of the ¡ offence.”
¡ “But it will be proper to go a little further on this j subject. As the intention constitutes the crime, [ there is no doubt that since the passage of the Act, 1 if a man should mix a glass of poison for one person j and another should take it, it would be murder in ! the first degree. So, if he were to shoot at one and | kill another, it would be murder in the first degree, j Where the original intent is murderous, the crime, on legal principles, is the same, whoever happens to be killed. This position, it is believed, is not less true on moral than on legal grounds. The murder *148 ous intention, the wicked disposition of heart, being ■once established against a particular person, the nature and guilt of the action are immutably fixed, ■whoever may happen to be killed.
“Under murder in the second degree, mentioned in our Act of Assembly, may be included those Cases of constructive murder which are often stated in the English Law Books, and which, in that country, are followed by capital punishment. A man shooting at a tame fowl, with intent to steal it, kills a person, that, in England, is murder, punished with death; but, in Pennsylvania, it would be murder in the second degree. An Officer of Justice or a private man, is killed, in endeavoring to part two persons whom he sees fighting: this, in England is murder; but, in Pennsylvania, it will be murder in the second degree. A person throws a large stone, or a piece of timber, from a house into the street, where heknowsmany people are passing and re-passing, and kills another; this in England is murder; but, in Pennsylvania, it would be murder only in the second degree. So, a man in England, riding in a road a dangerous horse apt to strike, happens to kill a person, in that country it is murder; but in Pennsylvania it is murder in the second degree. Smith’s Trial, p. 89, 90.
The following remarks were made by Judge Rush, in his charge to the jury in the Case of the Commonwealth v. Richard Smith, tried in 1816, before the Judges of the Court of Common Pleas, in Philadelphia.
“In the Case of the Commonwealth v. Mulatto Bob, tried at Easton, in 1795, before Chief Justice M’Kean and Judge Smith, it was decided by the Court, that since passing the Law of 1794, the intention still remains the criterion of the crime; that the intention of the prisoner is to be collected from his words and actions, and that on the supposition, a man, without uttering a word, should strike another on the head, with an axe, it would be deemed premeditated violence.
“In the Case of the Commonwealth v. O’Hara, tried before Chief Justice M’Kean and Judges Shippen and Smith, in Philadelphia, in the year 1797, the Court held, if the murder be committed with an instrument, likely to kill, it is wilful; and to make it wilful and premeditated the party must have time to reflect and to frame the design, however short the time may be, and must intend to kill.
“If the Defendant has time to think and did intend to kill for a minute, as well as an hour or a day, it is a wilful, deliberate and premeditated killing, constituting murder in the first degree, within the Act of Assembly.
“we shall presently examine the conduct of the prisoner, and compare it with the principles laid down in these cases.
“In the mean time, we observe to you, gentlemen, that the principles just stated are from the highest Judicial authority in Pennsylvania, and that it is the duty of this Court, and of you, as jurymen, to submit to them.
“For a moment, however, gentlemen, let us enquire into their correctness.
“The wilful, deliberate and premeditated killing a person is, by the law of 1794, described to be murder in the first degree.
“What is it to kill a person wilfully ? It is the same thing as killing him on purpose. He who does an act wilfully, does it on purpose; and he who does an act on purpose, does it wilfully. ,
“The next ingredient to make the killing murder in the first degree is, it must be deliberate. But does the law fix the' time of such deliberation? No such thing, gentlemen. Does it say the prisoner must ponder over the crime for years, for months, for weeks, or days, or hours, or for any other given time? What sort of Law would it be if such a construction were put upon it by Courts and juries?
"Suppose, for example, it should be contended, that it must appear the party had pondered on the commission of the crime one hour, or five minutes before the fact.
“I ask, then, why fix an hour, or five minutes, for deliberation ? Why not half an hour ? Why not two hours? Why not two minutes?
“The truth is, in the nature of the thing no time is fixed by the Law, or can be fixed, for the deliberation required, to constitute the crime of murder.
“To deliberate is to reflect, with a view to make a choice; and, if it appeared the party did reflect, though but for a minute before he acted, it is unquestionably a sufficient deliberation, within the meaning of the Act of Assembly.
“The last requisite to constitute murder in the first degree is, that the killing must be premeditated,
“To premeditate is to think of a matter beforehand ; it is to conceive of a thing before it is executed. The word premeditated, would seem to imply something more than deliberate, and may mean that the party not only deliberated, but had framed in his mind the plan of destruction.
“We, therefore, say to you, gentlemen, and we say it confidently, that it is equally true, both in fact and from experience, that no time is too short for a wicked man to frame in his mind a scheme of murder, and to contrive the means of accomplishing it.” — Smith’s Trial, p. 230, 321.
REGULA GENERAEIS.
In future, in ail motions to change the venue, the petition and affidavit shall set forth the particular facts from which the petitioner is induced to believe that he cannot have a fair trial in the county where the venue is laid, or to which the cause has'been removed, if the cause assigned by him is of such a nature as to admit of such a particular specification, and where the cause assigned is of such a general nature as to preclude a particular specification, he shall support his application by affidavits of disinterested persons.
In all applications to change the venue, the notice given to the opposite party, shall state the cause to be assigned in support of the application.